J-A32037-17
J-A32038-17

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: C.S.W. and C.L.W., MINORS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.N.L., MOTHER | : | No. 1045 MDA 2017 |

Appeal from the Decree May 31, 2017
in the Court of Common Pleas of Lancaster County
Orphans' Court at No(s):  1317 of 2016
1318 of 2016

| | | |
|---|---|---|
| IN RE: C.S.W. and C.L.W., MINORS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.M.W., FATHER | : | |
| | : | No. 1054 MDA 2017 |

Appeal from the Decree May 31, 2017
in the Court of Common Pleas of Lancaster County
Orphans' Court at No(s):  1317 of 2016
1318 of 2016

BEFORE:   OTT, DUBOW, and STRASSBURGER, J.*

MEMORANDUM BY STRASSBURGER, J.:              **FILED JANUARY 29, 2018**

In these consolidated appeals, T.N.L. (Mother) and A.M.W. (Father) appeal from the decree entered May 31, 2017, in the Court of Common Pleas of Lancaster County, which terminated involuntarily their parental rights to their minor children, C.S.W. (born in 2011), and C.L.W. (born in 2013) (collectively, Children).  We affirm.

*Retired Senior Judge assigned to the Superior Court.

[Children] first came to the attention of the [Lancaster County Children and Youth Social Service Agency ("the Agency")] due to serious truancy concerns for another child[1] living in the same household. [At that time, Children were living in the home with, among others, Father and Mother in a residence owned by paternal grandfather]. During their investigation, the Agency became aware of a string of domestic violence incidents involving the parents as well as drug use by the parents. Father was arrested for an incident on October 12, 2014, and charged with simple assault and harassment. At the time, Mother reported that Father knocked her unconscious and had been abusing her for several months. The investigating police officer observed a cut on Mother's head and blood stains on her shirt. Though Mother recanted her allegations of abuse by Father at the hearing on his charges, Father pled guilty to one count of harassment. Mother has since credibly testified that Father inflicted physical violence on her during their relationship. Domestic disturbances were a regular occurrence in the home prior to the placement of [C]hildren; from October 12, 2014, to February 1, 2015, the police investigated nine reported incidents.

Orphans' Court Opinion, 7/25/2017, at 1-2. Additionally, on January 28, 2015, Mother "was drug screened and tested positive for Oxycodone."

Based upon the foregoing, on February 3, 2015, the Agency filed for physical and legal custody of Children. On February 12, 2015, following a shelter care hearing, Children were placed in the Agency's physical custody, and on April 9, 2015, the Agency received legal custody of Children when they were adjudicated dependent.[2] With the initial objective of reunifying Children

_____

[1] Father is not the biological father to this child.

[2] The Agency was given temporary legal custody on February 12, 2015, following the shelter care hearing. *See* Shelter Care Order, 2/19/2015.

with their parents, both Mother and Father were provided with a permanency

plan.

> Mother and Father failed to make significant progress on their reunification plan. At the first permanency review hearing, held on July 22, 2015, Mother and Father had made minimal progress and had been minimally compliant. At the second review hearing on December 11, 2015, Father had minimal, and Mother had no, compliance and progress. At the third review hearing on June 16, 2016, Mother and Father both had minimal compliance and progress. Just prior to the latter hearing, Father threatened to harm Mother if the review hearing did not go well for him. Th[e orphans' c]ourt noted in its Permanency Review Order from the June 16, 2016, hearing that "the reported threats [Father] sent to Mother less than a week prior to this hearing indicate a lack of true change on his part." Mother's contact with [C]hildren was limited to phone calls as approved by a therapist at that time due to Mother's lack of contact with the Agency since August 2015. On August 31, 2016, [C]hildren moved into their current, potentially permanent, resource home. At the final permanency review hearing, held on December 1, 2016, Mother's and Father's minimal compliance and progress resulted in the suspension of all visitation with [C]hildren. At that time[,] Mother had three active warrants for her arrest. Father did not attend this hearing despite receiving appropriate notice.

*Id.* at 2-3.

On June 15, 2016, the Agency petitioned to terminate the parental rights

of Father and Mother pursuant to 23 Pa.C.S. §2511(a)(1), (2), (5), (8) and

(b). The orphans' court presided over the hearings which were held on March

23, 2017, and May 31, 2017. Over the course of the two days seven witnesses

testified, including Mother; Father; paternal grandfather; Richard Wheeler,

director of Wellness Counseling Associates; Robert Pratt, case supervisor;

Nicole Seroky, a court appointed special advocate (CASA); and Lisa Sallad, a

counselor at Samara House. Children were not present at the hearings, but

Children's joint guardian *ad litem* was present at both hearings.[3] Upon completion of the testimony, the orphans' court issued a decree terminating involuntarily Mother's and Father's rights to Children. On June 29, 2017, and June 30, 2017, respectively, Mother and Father timely filed notices of appeal, along with concise statements of errors complained of on appeal.

On appeal, Mother and Father both argue that the orphan's court abused its discretion in terminating their parental rights.[4] Mother's Brief at 8; Father Brief at 2.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

---

[3] It appears from a review of the transcript, that court-appointed counsel for Children did not attend the first hearing on March 23, 2017. The record is devoid of any reference or reason as to why counsel was not in attendance.

[4] Children's guardian *ad litem* and court-appointed counsel filed responses to these appeals. Children's legal representative submitted a statement on behalf of Children to reiterate as he had at the termination hearing, "that after having explained the nature of these proceedings and possible outcomes to [C]hildren in a manner reasonably believed to be best understood by [C]hldren, [C]hildren were not able to and did not articulate a position that they wanted to take in these proceedings." Legal Representative of Children's Statement at 1. The guardian *ad litem* supports the termination of Mother's and Father's parental rights. Guardian *Ad Litem* Brief in Appeal of Mother at 1-2; Guardian *Ad Litem* Brief in Appeal of Father at 3-4.

- 4 -

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [subs]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [subs]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We address these appeals sequentially.

**Mother's Appeal**

Mother presents four questions for this Court's consideration.

I.  Whether the [orphans' c]ourt erred when it terminated Mother's rights?

II.  Whether the [orphans' c]ourt erred in concluding that Mother had, by conduct continuing for more than six [] months, evidenced a settled purpose of relinquishing a parental claim to [Children] and had refused or failed to perform her parental duties.

III.  Whether the [orphans' c]ourt erred in concluding that the evidence clearly and convincingly established that the repeated and continued incapacity, neglect, or refusal of Mother had caused [Children] to be without essential parental care, control and subsistence necessary for their physical and mental well-being and that the conditions and causes of the incapacity, neglect, or refusal cannot or will not be remedied by Mother?

> IV. Whether the [orphans' c]ourt erred in finding that terminating Mother's parental rights would best serve the needs and welfare of [Children]?

Mother's Brief at 8.[5]

The orphans' court terminated Mother's parental rights to Children pursuant to subsections 2511(a)(1), (2), (5), (8) and (b). For the reasons cited in footnote 5, and because we need only agree with the court as to any one subsection of 2511(a) in order to affirm,[6] we address only Mother's issue pertaining to the court's decision to terminate under subsection 2511(a)(1), which provides as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of

---

[5] Although Mother sets forth four issues in her questions presented, her argument section is not divided into equally as many parts. **See** Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued."). Indeed, although presented as an issue on appeal, Mother does not address or contest the orphans' court's finding that "terminating Mother's parental rights would best serve the needs and welfare of" Children, within the argument section of her brief. Mother's Brief at 8. **See Giant Food Stores, LLC v. THF Silver Spring Dev., L.P**, 959 A.2d 438, 444 (Pa. Super. 2008) ("The Rules of Appellate Procedure state unequivocally that each question an appellant raises is to be supported by discussion and analysis of pertinent authority.") (quotation marks and citation omitted). This Court has emphasized that it is the obligation of the appellant to present arguments that are sufficiently developed for our review. **In re R.D.**, 44 A.3d 657, 674 (Pa. Super. 2012). "We will not act as counsel and will not develop arguments on behalf of an appellant." **Id.** (quotation omitted). Accordingly, we find this claim waived.

[6] **In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

> relinquishing parental claim to a child or has refused
> or failed to perform parental duties.

23 Pa.C.S. § 2511(a)(1).

To meet the requirements of subsection 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." **In re Z.S.W.**, 946 A.2d 726, 730 (Pa. Super. 2008) (citing **In re Adoption of R.J.S.**, 901 A.2d 502, 510 (Pa. Super. 2006)).  The court must then consider "the parent's explanation for his or her conduct" and "the post-abandonment contact between parent and child" before moving on to analyze subsection 2511(b).  **Id.**  (quoting **In re Adoption of Charles E.D.M.**, 708 A.2d 88, 92 (Pa. 1998)).

Here, Mother argues the trial court erred in terminating her parental rights because she "was making progress on her plan" and addressing the issues that led to Children's placement.  Mother's Brief at 12.  Specifically, Mother avers at "the time of the termination hearing [she] had completed drug treatment, [] was working[,] and [] had secured appropriate housing. Although Mother had not completed her plan at the time of the termination hearing, she had made significant progress towards her goals."  **Id.**

With respect to her conduct before the filing of the termination petition, Mother testified that prior to the suspension of her visitation with Children, she did not attend visits because she "was in active addiction."  N.T,

5/31/2017, at 112. Mother did admit that she was not in contact with the agency from June 2015 to August 2016, and during that time she was aware and did receive notice that a termination petition was filed by the Agency. *Id.* at 130. Mother also acknowledged that the completion of the treatment programs she participated in all "occurred after the time the petition was filed to terminate" her parental rights. *Id.* at 131.

The orphans' court set forth the following in support of termination.

Mother admitted to the finding of dependency in April 2015 but did not make substantial progress on her plan until after she received notice of the filing of the termination petition [on June 15, 2016]. Mother did not contact the Agency from June 2015 to June 2016. She failed to [address timely] her mental health, substance abuse, domestic violence, parenting, financial stability, and housing issues; her objectives were incomplete at the time of the termination petition filing. Mother was minimally cooperative with the Agency.

Mother did not make progress on her mental health and substance abuse goals. Per a March 19, 2015, biopsychosocial evaluation Mother was recommended to attend outpatient mental health and substance abuse treatment for no less than a year. Mother disappeared for approximately a year between July 2015 and July 2016 with the Agency having no knowledge of her whereabouts. Mother claims to have last abused drugs on July 4, 2016.

Mother failed to complete her domestic violence goals or even enroll in domestic violence counseling prior to August 1, 2016. Mother did not notify the Agency about her domestic violence treatment program or give the Agency an opportunity to speak with her domestic violence counselor at Samara House until December 1, 2016.

Mother made little progress on her commitment and parenting goals. Mother last visited [Children] on July 28, 2015. Her visits were suspended on December 1, 201[6]. She did not

complete any parenting classes prior to being notified of the termination petition in June 2016.

Mother did not have consistent income prior to the filing of the termination petition. The Agency had no record of Mother working at the time of filing. The Agency first received pay stubs from Mother after August 1, 2016. Mother did not have consistent housing prior to the filing of the termination petition. Prior to June 2016, Mother reported that she was living with Father. Father testified that they separated shortly after [Children] were placed into Agency care. Mother did not testify about any other housing prior to entry into her treatment programs in June 2016.

Orphans' Court Opinion, 7/25/2017, at 5-6.

The orphans' court's conclusions are supported by the record. Although we are cognizant that Mother began to make progress and complete some of her goals prior to the termination hearing, subsection (a)(1) requires the court to focus on the "six months immediately preceding the **filing of the petition.**" 23 Pa.C.S. § 2511(a)(1) (emphasis added).

In the six months prior to the filing of the termination petition in June 2016, Mother's whereabouts were unknown, as Mother failed to stay in contact with the Agency. N.T, 5/31/2017, at 130. The Agency reported that they "had minimal cooperation and contact with [Mother]". N.T., 3/23/2017, at 55. Most significantly, Mother last visited with the Children in July 2015. *Id.* at 60. Eventually, in December 2016, Mother's visitations were suspended for lack of contact and failure to show up for visits. *Id.*

Additionally, Mother self-reported that she last used drugs in July 2016. N.T, 5/31/2017, at 107. In fact, prior to the filing of the termination petition, it appears Mother was non-compliant and made very little progress towards

her reunification goals. N.T., 3/23/2017, at 55-61. This includes a failure to complete (1) mental health and substance abuse treatment; (2) domestic violence treatment; (3) her income and housing objective; and (4) her commitment objective to Children. *Id.*

Therefore, we conclude that the orphans' court did not err in finding that that the "parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S. § 2511(a)(1).

**Father's Appeal**

The orphans' court terminated Father's parental rights to Children pursuant to subsections 2511(a)(1), (2), (5), (8) and (b). Father contends the orphans' court erred "when it found that the [Agency] had proven, by clear and convincing evidence, that Father's conduct satisfied the statutory grounds for termination." Father's Brief at 2. Specifically, Father avers, *inter alia*, that he had completed all objectives set forth in the child permanency plan. *Id.* at 6-22.

In his brief, Father does not challenge the termination of his parental rights pursuant to subsection 2511(b). Therefore, we analyze the orphans' court's decision pursuant to subsection 2511(a) only.[7] Here, we analyze the

_____

[7] In doing so,

court's decision to terminate under subsection 2511(a)(8), which provides as

follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

---

> [w]e acknowledge that panels of this Court have sometimes relied on **In re C.L.G.**, 956 A.2d 999 (Pa. Super. 2008) (*en banc*), to address Section 2511(b), even where the appellant has made no effort to present a challenge regarding that section. In **C.L.G.**, this Court affirmed an order involuntarily terminating the appellant mother's parental rights. We initially analyzed the trial court's decision to terminate pursuant to Section 2511(a)(8). We concluded that the evidence supported the court's decision, and then proceeded to address Section 2511(b), even though the appellant mother did not present any challenge regarding that section. This Court did not provide an explanation for its decision to address Section 2511(b). We merely stated: "Although Mother does not challenge the trial court's analysis of Section 2511(b), we proceed to address this issue nonetheless." **Id.** at 1010. We do not read **C.L.G.** to require consideration of Section 2511(b) in every appeal from a decree involuntarily terminating parental rights. This Court did not hold that consideration of Section 2511(b) was necessary in **C.L.G.**, nor did we cite any authority in support of our decision to address Section 2511(b) *sua sponte*.

**In re M.Z.T.M.W.**, 163 A.3d 462, 466 n.3 (Pa. Super. 2017).

23 Pa.C.S. § 2511(a)(8).

Subsection 2511(a)(8) represents the determination that "a parent's basic constitutional right to the custody and rearing of his … child is converted, upon the failure to fulfill … parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In the Interest of K.Z.S.*, 946 A.2d 753, 759-60 (Pa. Super. 2008) (quoting *In re B.N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004)).

Instantly, by the time the Agency filed a petition to terminate Father's parental rights in June 2016, Children had been out of Father's care for well over a year. *See* N.T. 3/23/2017, at 51 ("[C]hildren were placed in the physical custody of the Agency on February 12[], 2015. Legal custody of the children was obtained by order of the Court of Lancaster on April 9[], 2015.").

> Once the 12–month period has been established, the court must next determine whether the conditions that led to the [children's] removal continue to exist, despite the reasonable good faith efforts [the Agency] supplied over a realistic time period. Termination under [subs]ection 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of [the Agency's] services.

*K.Z.S.*, supra at 759 (quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1133 (Pa. Super. 2007)).

The orphans' court offered the following analysis:

> The permanency plan goals for Father related to domestic violence, mental health, substance abuse, parenting, financial stability, housing, and commitment. Though Father made efforts to complete his plan, he regularly refused to work with the Agency

- 12 -

and did not make any progress beside his initial evaluations for almost a year. At the time of the filing of the termination petition all of Father's goals were incomplete.

Father completed an evaluation at Triad Treatment Specialists ("Triad") on May 5, 2015, due to the concerns related to substance abuse and domestic violence. Triad recommended that Father complete a mental health evaluation, drug and alcohol evaluation, domestic violence counseling, a batterer's intervention program, and random drug tests. On June 30, 2015, upon the referral of the Agency, Father partially completed a psychological evaluation with Dr. Jonathan Gransee, who recommended that Father complete twenty-six sessions of weekly outpatient mental health services.

Nearly six months after the evaluation with Dr. Gransee, Father on his own initiated treatment with Richard Wheeler of Wellness Counseling Associates ("Wellness"). He did not contact the Agency prior to doing so, and the Agency did not, and was not asked to, provide Wellness with information about Father's situation. Mr. Wheeler was aware that a psychological evaluation had been performed, but did not know Dr. Gransee's recommendations or ask the Agency for a copy of Dr. Gransee's report. Mr. Wheeler did not receive a copy of the Triad report, and Father did not notify him that Triad had performed an evaluation. Mr. Wheeler testified that he "probably should have" requested Gransee's report. Father completed fourteen hours of anger management education over two days, not therapy or counseling as had been recommended. The caseworker is not aware of any mental health treatment Father has completed.

Father has a history of drug use. Mr. Wheeler testified that Father was evaluated by Wellness on May 7, 2016, for drug and alcohol use without the Agency providing information, and Father was diagnosed with cannabis misuse disorder/alcohol use disorder. The evaluation was based on Father's self-report of past drug use. Wellness provided Father with six sessions of drug and alcohol counseling which he completed on June 17, 2016. Father has completed no other drug and alcohol counseling or treatment. When drug tested prior to his last visit on September 7, 2016, Father provided a cold urine sample that could not be tested. Though asked, Father did not provide another sample for testing. In the past, Father and Mother provided a child's urine in place of their own to pass drug tests.

Father attended the domestic violence education program at Wellness from April 19, 2016, until June 2, 2016. Mr. Wheeler did not interview Mother, or receive information from the Agency. Mr. Wheeler clearly stated that these were educational sessions, and not therapy or counseling. Father has not reported any domestic violence treatment to the Agency.

After his domestic violence educational classes and anger management training were complete on June 12, 2016, Father was involved in at least three incidents that indicate ongoing anger management issues. In mid-June 2016, Father threatened [M]other with serious bodily harm if he lost custody of [C]hildren. In July 2016, Father accused the CASA of lying on her report and when she declined to change her report he became angry enough that she was forced to hang up on him. In January 2017, Father was involved in a domestic violence incident with his paramour where he reportedly had a knife and flipped a table onto a child. Though the charges initially filed were later dropped, Mr. Wheeler indicated that an incident such as the one alleged in January 2017 between Father and Father's paramour would cause him to recommend further counseling and treatment for Father. Father received no domestic violence treatment or counseling since he completed the program at Wellness on June 2, 2016.

Father's housing goal is incomplete. Paternal grandfather owns the residence Father claims as his home. At one point, paternal grandfather evicted Father from this home. Father has been absent from the residence for significant periods of time, but claims that he will return when [C]hildren are returned to him. Father did not reside in his home for several months due to renovations which were completed in December 2016. Father does not have a written lease to the property. In March 2017, the Agency sent multiple certified and first-class letters to Father to the address that were returned unclaimed and undeliverable. The Agency has also been unsuccessful in its attempts to speak with someone at the residence. Father has never established a home for [C]hildren to return to, despite receiving strong encouragement to do so.

Father claims that his income has been stable throughout this case, but he did not provide the necessary information to the Agency to verify his claim. Father did not submit any pay stubs to the Agency until March 2017. During the last two years, Father

has only provided evidence of two months' worth of consistent work. Father's visits with [C]hildren were infrequent and inconsistent prior to the suspension of visitation on December 1, 201[6]. Father did[ not] visit between July and December in 2015. Father claimed that this was due to his difficult work schedule, but he never provided the Agency with a schedule to help his caseworker facilitate his visits. Even if Father's lack of visitation in 2015 was due to his difficult work schedule, the paucity of visits in 2016 is inexplicable. From January 1 until December 1, 2016, Father visited [C]hildren only eleven times. During that time, Father was permitted to visit every other week. Father provided no explanation for his minimal contact with [C]hildren during this period and did not ask the Agency to increase his visits. Father scheduled a visit on November 8, 2016, at which the resource family, the CASA, and [C]hildren were present, but Father did not show up or call to cancel. Neither child had much of a reaction to missing a visit with Father.

Orphans' Court Opinion, 7/25/2017, at 6-10 (citations omitted).

While Father asserts he has taken steps towards the completion of the permanency goals, maintaining that he has made "substantial progress" with his parenting plan, Father's Brief at 5, the orphans' court found, *inter alia*, that Father had yet to address sufficiently his issues with domestic violence, which had contributed to Children's initial removal and placement. The orphans' court's conclusions are supported by the record.

Specifically, although Father was supposed to attend domestic violence counseling, he only completed domestic violence educational classes and anger management. N.T., 3/23/2017, at 7. Mr. Wheeler, the director of Wellness, testified that the classes Father attended were educational and

therefore, constitute neither therapy nor counselling.[8] *Id.* at 13-14. The Agency received no report from Father that he completed any domestic violence treatment other than the educational classes cited *supra*, nor is the Agency aware of any mental health treatment. N.T., 5/31/2017, at 50-51.

Most troubling is the testimony elicited at the termination hearing that after Father had completed these classes, he was "involved in at least three incidents that indicate ongoing anger management issues[,]" which included reported domestic violence.[9] Orphans' Court Opinion, 7/25/2017, at 8. *See also* N.T., 5/31/2017, at 77 (Ms. Serosky, Children's CASA, testified that Mother showed her text messages from Father "telling her she'd better pick out her casket if he loses custody of [Children].")); *id.* at 91 (Ms. Serosky testified that a phone call in July 2016 with Father "escalated to the point" that she terminated the phone call when Father accused Ms. Serosky of lying on a report, telling her she "needed to change it before we got into court.");

---

[8] The information received by Wellness was all self-reported by Father. *Id.* at 39.

[9] We are not persuaded by Father's argument that his domestic violence and anger management issues do not pose a threat to Children. *See* Father's Brief at 8 ("Anger, especially when not directed at the child, does not preclude a parent from caring for his child."). As noted by the orphans' court with respect to C.S.W.: "The relationship between [C.S.W.] and Father is strained by the child's memories of domestic abuse perpetrated by Father against Mother. [C.S.W.] vividly remembers at least one domestic violence incident where Father physically attacked Mother. The child made an unsolicited comment to the CASA that she did not want to go to a home where there is yelling, fighting, and hitting." Orphans' Court Opinion, 7/25/2017, at 11 (citations omitted).

and *id.* at 18 (A Childline report indicated that there was a domestic violence incident[10] where Father "had a knife and flipped a [t]able onto a child.").[11]

Lastly, the orphans' court determined that termination of Father's parental rights was in the best interest of Children.

> The [c]ourt believes that the best interest of [Children] is served by their remaining in their foster home and being adopted. [C]hildren have been in care for more than twenty-seven months. When placed into Agency care in February 2015, [C.S.W.] was three years old and C.L.W. was one year old; they are now six and four years old, respectively. [Children] cannot wait for an indefinite period without the stability and devotion of an appropriate and final family to see if [] Father will finally be able to provide an appropriate home. They have not lived with Mother and Father for more than two years. [C]hildren deserve an environment which will provide them with the love, care, and concern of an appropriate family.

---

[10] When questioned about the fact that this incident was later categorized as "unfounded," the case supervisor indicated that it was still listed as a factor related to domestic violence "because of the fact that just because the girlfriend chose not to come to court doesn't mean it didn't happen." N.T., 5/31/2017, at 19. Even without this incident, for the reasons cited *supra*, we find sufficient evidence exists to terminate Father's rights pursuant to subsection (a)(8).

[11] In response, Father argues that "the anger incidents alluded to by the [orphans'] court … are wholly false not [*sic*] at all clear from the record." Father's Brief at 9. In support, Father mostly attacks the credibility determinations made by the orphans' court after hearing the aforementioned testimony. *Id.* at 9-11. It is well-settled that this Court may not "second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion." *In re C.M.C.*, 140 A.3d 699, 704 (Pa. Super. 2016).

Though some bond exists between the parents and [C]hildren, it has been frayed and weakened to the point of non-existence by the parents' behavior during the last two years. []Father visited eleven times in 2016, and even when he did visit he was not always focused on [C]hildren. At Father's final visit on September 7, 2016, [C.S.W.] held back and wanted to be carried into the visit by her resource mother. [C.S.W.] was only willing to go into the visit if the CASA came back with her. The relationship between [C.S.W.] and Father is strained by [C.S.W.'s] memories of domestic abuse perpetrated by Father against Mother. [C.S.W.] vividly remembers at least one domestic violence incident where Father physically attacked Mother. [C.S.W] made an unsolicited comment to the CASA that she did not want to go to a home where there is yelling, fighting, and hitting.

[C]hildren have been placed together in their current home since August 31, 2016, and are doing well in placement. Their home is a stable and loving resource. [C]hildren are doing very well in school and their community. [C.S.W.] is receiving art trauma therapy at school. Per the CASA, [Children] are absolutely attached to their resource parents.

Both the CASA and the guardian *ad litem* support the termination of the parental rights of [] Father. During the more than two years since her appointment, the CASA visited [C]hildren at least monthly, far more often than either parent. Based on her extensive observations during the last two years, the CASA believes that parental rights termination is in the best interest of [C]hildren, and that neither child will suffer emotional harm in doing so. It is clear to th[e orphans' court] that the best interest of these children will be served by [] Father's rights being terminated and [Children] being adopted.

Orphans' Court Opinion, 7/25/2017, at 10-12 (citations omitted). We see no reason to disturb the orphans' court's findings, which are supported by the record.

[B]y allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to

- 18 -

assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

***In re Adoption of R.J.S.***, 901 A.2d 502, 513 (Pa. Super. 2006).

Accordingly, we conclude that the orphans' court did not err in finding that that the "conditions which led to the removal or placement of [Children] continue to exist." 23 Pa.C.S. § 2511(a)(8).

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion by terminating the parental rights of Mother and Father. We therefore affirm the court's May 31, 2017 decree.

Decree affirmed.

Judge Dubow joins.

Judge Ott concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/29/18